BONDED ARMORED CARRIER, INC. *v.* KORVETTES
DIVISION OF ARLEN REALTY & DEVELOP-
MENT CORP.

[No. 148, September Term, 1972.]

*Decided March 13, 1973.*

*Motion for rehearing filed April 4, 1973; denied April 5, 1973.*

The cause was argued before MURPHY, C. J., and
BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Howard E. Wallin* for appellant.

*Malcolm L. Jacobson,* with whom were *Ray J.*

*Fleischhacker* and *Parker, Chapin & Flattau* on the brief, for appellee.

McWilliams, J., delivered the opinion of the Court.

Contrary to the old rule of thumb that money in motion seems always to leave tracks, the $7,567.09 with which we shall here be concerned appears to have disappeared without a trace. The trial judge, Harris, J., sitting without a jury, thought it "clear from the evidence that efforts by all parties to locate . . . [the $7,567.09] have shed no light on the mystery." Counsel, at our invitation, volunteered conflicting theories in respect of its disappearance which, to be sure, they readily conceded lacked evidentiary support. Although we have been left neither wiser nor better informed, we think the judgment of the court below must nevertheless be reversed. The parties seem not to be in significant disagreement in respect of the facts, at least as they are set forth in the record.

In November 1968 the appellee (Korvette) and the appellant (carrier) agreed in writing that, for a period of two years, the carrier would "call for sealed shipments containing moneys, checks, and/or securities, to receipt therefor, and to deliver same in like condition to" The Equitable Trust Company (the bank).

Korvette's money room, significantly perhaps, is where it all began. This was, and perhaps still is, the domain of Eva Kegan and Pauline Thrasher who were responsible for the counting of the money, for certain accounting functions pertinent thereto, and whose testimony is the source of much of what follows. They were responsible also for the preparation of the "sealed shipments" to be "call[ed] for" by the carrier. In the afternoon of 10 March 1970 one or the other of them, perhaps both, prepared the $7,567.09 for shipment. The deposit slip [1] indicated it consisted of currency, coin and checks, all of which were placed in a #5 cloth bag. The bag was tied with strong twine the ends of which were

---

1. Korvette's copy.

run through holes in a lead slug. When the ends of the twine were pulled tight the lead slug was run up against the neck of the bag and crimped with a tool which made impossible any movement of the twine and consequently any access to the inside of the bag; at the same time the crimper imprinted on the slug the words "EJK. 35 Towson." Then there was tied to the neck of the bag a cardboard tag upon which was stamped or printed, "For Deposit Only Pay to the order of The Equitable Trust Co., Baltimore, Md. Korvettes #35. Division of Arlen Realty & Development Corp. 611-0120-1." The identity of the carrier was written on the tag and, according to Mrs. Kegan, a figure supposed to indicate the aggregate amount of the currency, coin and checks inside the bag. Sometimes, she added, they would "throw in" an extra deposit but they "don't put that on the outside of the bag." In fact, she admitted the possibility that the bag might have contained another deposit. Then there was entered upon a printed receipt form (the book) the date "3-9" and under the column entitled "Said to contain" was entered the figure $7,567.09. At the top of each page of the book there is printed:

> ". . . It is agreed that all these sealed packages are to be distinctively and securely sealed by the consignor and that Bonded Armored Carrier, Inc., shall in no event be liable for any shortage claimed in any such sealed package delivered to it not so distinctively and securely sealed. *Each package to have marked thereon the amount said to be contained therein,* and in case of the loss of any sealed package Bonded Armored Carrier, Inc., shall in no event be liable for more than the value so marked thereon and stated herein." (Emphasis added.)

Finally the bag was placed in the money room vault where it remained overnight.

During the morning of 11 March $10,500 in currency was prepared for shipment. The money together with

the deposit slip was placed in a larger #12 bag and tied, crimped and tagged in like manner. The entry in the book was made as before except that the date entered was "3-10." The bag was then placed in the vault and the crimping tool [2] was returned to the locked drawer where it was kept.

Later in the same day another deposit, $4,972.95 ($1,360.00 in currency and $3,612.78 in checks), was prepared for shipment. Since the carrier's agents had not yet arrived the #12 bag containing the $10,500 deposit prepared earlier was cut open. The twine, the crimped slug and the tag were discarded. The new deposit, $4,972.95, was put into the same bag with the $10,500 and the bag was retied with twine, the slug was crimped, and a new tag indicating that the bag was supposed to contain an aggregate amount of $15,472.95 was attached. The $10,500 figure in the book was erased and in lieu thereof $15,472.95 was inserted. The next column is headed "No. of Items." Most of the figure "2" was written so as to appear to apply to the "3-10" entry. The upper loop could be said to apply to the "3-9" entry. Who put the figure "2" there or when is not clear. The bank, as shown in the next column, is the indicated consignee. The two bags (the #5 and the #12) were then tied together and placed in the vault.[3]

The carrier's armored truck, manned by a driver and two guards, arrived shortly before 3:25 p.m. on 11 March. Guard Bennett and his "back-up man" presented themselves at the "counter of the money room." They did not enter the money room nor did either of them have any access to the locked drawer where the crimper was kept. Bennett was handed the two bags still tied together. He wrote 3:25 in the column headed "Time rec'd" in a

---

2. There was no showing that a duplicate crimping tool existed.
3. Richard Schuler, Korvette's store manager, testified in respect of a curious practice. He was asked if the vault was closed or left open after the money room personnel left at 5:30 p.m. He said it would be left open "[b]ecause we have an occasion to make change out of it [loose cash in a tray] for refunds for the cashiers, purchases, or cashed checks for customers, and et cetera, and we use the money in the vault."

manner suggesting it might apply to both the "3-9" item and the "3-10" item but a perpendicular line above the time 3:25 suggests the "3-9" item might have been excluded. In the column headed "Rec'd by" he signed his name along an angular extension of the "3-10" line. They returned to the truck and locked the two bags in the rear. Bennett then made some notations on another form (the register) provided by the carrier. After inserting the date "3-11-70," in the column headed "Received From" he wrote Korvette-Towson; in the column headed "Delivered to" he wrote ET-Parkville; in the column headed "Bag" he wrote CB (for cloth bag); in the column headed "No." he put the number 2; in the column headed "Coin" he put a check mark. The remaining columns headed respectively "Pennies, Nickels, Dimes, Quarters, Halves, Standards" were left blank.

Bennett, to be sure, was not the best of witnesses and his testimony, given 26 months after the incident, while clear enough in significant respects is, in other respects, not so clear as it might be. At the time of trial he had been employed by the carrier for about three years. He did not "inspect" the lead slugs when the bags were handed to him but he was sure they were securely sealed. Had this not been so, he said, he would immediately have been aware of it. Asked if he checked the figures on the tags against the figures in the book he said he didn't remember. Asked if he "normally check[ed] those figures" he said, "You're supposed to." Although counsel did not press the point we think one would very nearly be obliged to infer that normally he did *not* check the tags against the book. Without doubt his testimony suggests his confusion in respect of the source of the $15,472.95 figure he wrote on the register after he returned to the truck. In one place he said he got this figure "off one of the tags." He could not recall whether he checked the second tag. Asked if he added "the two tags together" he replied, "Now you got me on that. I really don't remember to tell you the truth." Recalled at the court's request he thought he might have added the

amounts on the two tags. In another place he seemed to be saying that he got the figure from the book in the money room. The court and counsel made much of Bennett's confusion in this regard but, as we shall point out later on, we think it has very little significance.

After they left Korvette's store Bennett and his assistant returned to the carrier's garage where the contents of the truck, including Korvette's two bags, were unloaded and placed in the carrier's vault. Thereafter Bennett had nothing to do with the bags. In the morning the two bags were taken from the vault and placed in the truck for delivery to the bank. For this trip the driver was A, Jones and the guard was Anton Talkington. Talkington testified that before he left the garage he had inspected the bags and found them to be properly sealed. At 11:04 a.m. he delivered the two bags, still sealed, to the bank. In the last column of the register, headed "Rec'd by," there appears the signature of L. Carson.

Talkington said he delivered the two bags to Mrs. Lorraine Carson but that she did not open them in his presence and that he had no way of knowing what, if anything, was in the bags. Mrs. Carson testified that before she signed the register she satisfied herself that the amounts shown on the tags agreed with the amount shown on the register and, she added, the aggregate amount of the two tags was $15,472.95. She cut the twine, opened the bags and counted the contents. In the #5 bag there was a deposit slip in the amount of $4,-972.15 and currency and checks to match. In the #12 bag there was $10,500 in currency and a deposit slip to match. There were credited to Korvette's account on 12 March two amounts, one for $4,972.15 and one for $10,500. Validated copies of the deposit slips were sent to the Korvette store and to the New York accounting office. At no time during the month of March 1970, she said, did the bank receive a deposit of $7,567.09 from Korvette.

All was quiet until late in May when someone in Korvette's New York accounting office telephoned the store manager and suggested an investigation; it seems they could not find the reported $7,567.09 deposit on the bank's statement. After discussing the matter with the bank manager, the store manager questioned his own subordinates. He succeeded only in lurching into a quandary. For all we know he is still there.

In March 1971 Korvette sued the carrier and the bank. In the first count of its declaration it alleged the agreement of November 1968, the preparation on 10 March of the $7,567.09 deposit for shipment, the preparation on 11 March of the $10,500 and the $4,972.95 deposits for shipment, the delivery of two bags to the carrier, the receipt of the carrier and the loss of the $7,567.09 deposit. It should be noted that negligence was not mentioned. In the second count (against the bank) it alleged the forwarding of the three deposits to the bank, the receipt thereof by the bank, and the bank's failure or refusal to credit to its account the sum of $7,567.09.

The case came on for trial before Judge Harris, sitting without a jury, in May 1972. At the conclusion of the entire case he granted the bank's motion to dismiss and he denied a like motion by the carrier. On 8 June judgment absolute for $7,567.09 in favor of Korvette and against the carrier was entered and from that judgment the carrier has appealed.

Judge Harris thought it appeared reasonably certain, from the evidence, that the carrier was negligent in handling the shipments and that this negligence was the proximate cause of the disappearance of the $7,567.09. "In any event [he continued], assuming *arguendo* that Korvette's employees made a mistake in the preparation of the deposits, Bonded had the last clear chance to avoid the loss." [4] The evidence which seems to be relied upon

---

4. Both parties agree, and we concur, that the doctrine of last clear chance is not applicable here.

to support these conclusions is simply that Bennett did not compare the amounts on the tags with the amounts the bags were *said to contain,* as shown in the book, which Judge Harris presumed "he was obligated to do." Korvette, in this Court, adopts and expands the theory underlying these conclusions. Even if Korvette's employees stole the money Bennett's negligence, it says, made the theft or mistake possible. We do not agree that the evidence can support a finding of negligence.

It will be recalled that in the contract between the carrier and Korvette the carrier agreed "to call for *sealed* shipments containing moneys, checks, and/or securities, to *receipt* . . . [for *sealed* shipments], and to deliver same *in like condition* to a designated consignee." (Emphasis added.) We do not see in this record, nor have we been shown, any basis for a presumption, much less a finding, that the carrier's employees were "obligated" to compare the tags with the book. There is no such provision in the contract. There is no evidence that the carrier ever promised, either orally or in writing, to do so; there is no evidence that Korvette ever suggested or demanded any such procedure, nor does it appear that it ever relied upon the carrier to discover any discrepancies between the tags and the book. Indeed the only evidence that the carrier may have required its employees to make such a comparison is Bennett's testimony that the guards were "supposed to" do it. If there was such a requirement it seems to have been as much honored in the breach as in the observance and without any objection from Korvette. We think the dollar figures in the book were intended to serve only as Korvette's identification of the shipment. The carrier, by the signature of Bennett, acknowledged no more than that he had taken in hand two bags which Korvette identified as "said to contain" certain sums. There was no way for Bennett to know what was in the bags. They might be "said to contain" a million dollars but, in fact, they might contain nothing but old newspapers.

Our scrutiny of the book persuades us that, at best, it was an informal, untidy and inaccurate source of information. The dates shown thereon seem not to be the dates the bags were delivered to the carrier, although the time of day is shown. What follows is an excerpt from the book:

| "Date | Said to Contain | No. of Items | Consignee | Time Rec'd | Rec'd by |
|-------|-----------------|--------------|-----------|------------|----------|
| 3-5 | 6,319.52 ) | | Equitable Trust Co. | 2:35 | Steven Walton |
| 3-5 | 6,500.00 ) | 2 | | | |
| | 12,819.52 ) | | " " | 2:35 | Steven Walton |
| 3-5 | 12,630.47 | 2 | " " | 3:45 | Francis Roach |
| 3-6 | 18,500.00 | | " " | 3:45 | Francis Roach" |

Except for the fact that $12,819.52 is the sum of the two figures above it one could very well argue that Stephen Walton, on "3-5," receipted for two bags, one containing $6,319.62 (or $6,500) and the other containing $12,819.-52. The deposits, $6,319.52 and $6,500.00, were actually made by the bank on Monday, 9 March. The next two items, one dated 3-5, and the second dated 3-6, made up a two bag shipment which Francis Roach receipted for at 3:45, probably on Saturday, 7 March. The deposits were made on Monday but the truly extraordinary and astonishing circumstance is that the "18,500" item of "3-6" had shrunk to "14,000" on Monday when the deposit was made. One wonders whether the bag contained $18,500 or $14,000. What was on the tag we can never be sure but the testimony in the case at bar suggests it almost certainly was $14,000. In the light of Korvette's position here it would seem that someone had made off with $4,500 which, perhaps, it should also be trying to collect from the carrier. At any rate this circumstance denigrates the accuracy of the book. And, one might add, the erasure of the figure first entered on 11 March (supposed to have been $10,500) and the substitution of $15,472.95 violates one of the primary rules of bookkeeping, i.e., "erase nothing."

Judge Harris, without actually saying so, seems to have accorded Mrs. Kegan and Mrs. Thrasher full credibility. If their testimony is to be taken at its face value then it must be accepted as a fact that the tag on

one bag showed $7,567.09 and that the tag on the other bag showed $15,472.95. In that case it would not have mattered to Korvette whether Bennett did or did not compare the tags with the book. One must then believe that someone succeeded in penetrating the carrier's security screen, armed with a knife or scissors, a piece of the special twine used to tie the bags, two blank slugs, two of the special tags Korvette used to tie the bags, and Korvette's crimping tool. If one can believe all that then one must believe that someone cut the twine on both bags, discarded the twine and the slugs, removed from the #5 bag the deposit slip, $4,482.00 in currency, 36 cents in coins, and $3,084.73 in assorted worthless (to him) checks; one must believe also that he removed from the #12 bag the $1,360 in currency, 17 cents in coin, $3,612.78 in checks and the deposit slip for $4,972.95, and that he then placed the $4,972.95 and the deposit slip in the #5 bag. Having gotten this far one must believe also that he tied and crimped both bags, attached the two tags with corresponding amounts written thereon and tied both bags together. But one would need to be credulous indeed to believe that a thief with that much skill, information and expertise would take the risks and the trouble involved for some negotiable currency the amount of which he would not know until he opened the bags. Of course, there is not a shred of evidence to support any such theory and, in any event, what thief in those circumstances would not have taken the entire $16,342 in currency. We find it utterly incredible just as we must find incredible the testimony of Mrs. Kegan and Mrs. Thrasher that they affixed to the bags tags conforming to the figures in the book. We think one must believe that the tags Mrs. Carson compared with the amount on the register and with the deposit slips were the same tags that were on the bags when they were handed to Bennett.

Despite the fact that Bennett was a poor witness his testimony does make a certain amount of sense. He very well may have thought he was acknowledging the receipt

of two bags containing a total of $15,472.95. The figure "2" is peculiarly juxtaposed to the heavily written $15,-472.95 and in fact he did receive two bags the tags on which added up to that amount. That is the amount he wrote on his register and that is the amount that arrived at the bank. One would have to be hard-nosed indeed to characterize this as negligence, especially as he was under no legal obligation to do otherwise.

We find less than persuasive the subsidiary theory advanced at argument by Korvette that even though its employees may somehow have been at fault the negligence, assuming there was negligence, of the carrier's employees made the loss possible. It seems to us that before such a theory can be accorded merit it is incumbent upon Korvette to show how the loss was made possible. Otherwise it is nothing more than an empty insinuation.

Both briefs discuss the law of bailments but we do not think it is applicable here. The carrier has done what it contracted to do. It received two sealed bags, identified by Korvette in one place as "said to contain" $7,567.09 and $15,472.95 and further identified by tags upon which were marked the "amount[s] said to be contained therein." If Judge Harris found as a fact, and this is not so clear as it might be, that the tags were marked with the amounts $7,567.09 and $15,472.95 we think his finding was clearly erroneous. Maryland Rule 886. We think this record permits no finding other than that they were marked with the amounts $4,972.95 and $10,500. The carrier delivered these same bags, intact, to the bank, which entered the proper credit to Korvette's account.

As we said early on, we invited counsel for Korvette to venture his own personal theory in respect of what happened to the $7,567.09. He assumed of course that, when the bags were delivered to the bank, the tags still conformed to the figures in the book. He thought that when Mrs. Carson became aware, upon signing the register, that the amount involved was only $15,472.95, she found herself with a surplus of $7,567.09. His im-

plication, of course, was that she appropriated it to her own use. We think counsel has drawn the longbow. She would have known that Korvette had retained a copy of the deposit slip and that both the store and the New York office would be expecting copies showing that the deposit had been made. The record suggests that whatever else Mrs. Carson may have been, she was not stupid. And in this regard, recalling her testimony that duplicate deposit slips had been mailed to the store and to the New York office within the week and that the bank statement had been mailed at the end of the month, it is odd indeed that the disappearance of the $7,567.09 was not discovered until the end of May and then by some faceless individual in New York rather than by the people in the store. The judgment against the carrier will be reversed.

> *Judgment reversed.*
> *Costs to be paid by the appellee.*